UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA              CRIMINAL NO. 06-50007-01

versus                                JUDGE HICKS

ENRIQUE GURROLA                       MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

Before the court is a Motion to Suppress (Doc. 15) filed by Defendant. The motion seeks to suppress drugs found in a hidden compartment inside the vehicle driven by Defendant, as well as statements made by Defendant during and following the roadside traffic stop. For the reasons that follow, it is recommended that the motion to suppress be denied.

### Facts

An evidentiary hearing was held on July 10, 2006. The evidence at the hearing included a videotape (with partial audio[1]) of the traffic stop in question. Joint Exhibit 1. Tr. 20.

The evidence at the hearing establishes the following facts. Defendant was traveling East Bound on Interstate 20 near Bossier City, Louisiana when he was stopped by Louisiana

---

[1]There is audio of the initial portion of the stop, but when the search of the vehicle began, the microphone was turned off, and there are only portions of audio after that.

State Trooper Brett Davis for following another vehicle too closely and speeding 65 mph in a 60 mph zone. The videotape shows that the stop was initiated at approximately 13:59:30.

Defendant exited his vehicle and met with Trooper Davis near the rear of Defendant's vehicle (14:00:00). Trooper Davis requested Defendant's driver's license and asked Defendant how to pronounce his last name.[2] Trooper Davis introduced himself and advised Defendant that he had been stopped for following too closely. (Trooper Davis did not tell Defendant he had been stopped for speeding.) The license showed that it was issued to Defendant with a Laredo, Texas address. Tr. 7. Defendant stated he was traveling to see his daughter and son-in-law in Long Island, New York.

Trooper Davis then asked Defendant who owned the vehicle, and Defendant stated that it belonged to him. However, the vehicle had New York license plates. The vehicle registration – which was issued from the state of New York – showed that the vehicle was registered to Daniel Saldana of Laredo, Texas. Defense Ex. 2; Tr. 48-49. Trooper Davis testified that when Defendant handed the registration to Trooper Davis, Defendant's hands were shaking, his voice was quivering and he behaved nervously; however, these nervous behaviors are not apparent from the videotape. When questioned about the identity of the owner of the vehicle, Defendant stated that the vehicle belonged to his son-in-law, who let

---

[2]Although Spanish was Defendant's preferred language, the videotape confirms that Defendant had no difficultly communicating with Trooper Davis in English. However, an interpreter was provided for Defendant during the suppression hearing at the request of his counsel.

Defendant keep it. Defendant told Trooper Davis that he had possession of the vehicle for nine or ten months. However, the vehicle had been registered in April 2005, about seven months prior to the date of the stop. Trooper Davis testified that this made him suspicious because "that's a pretty big gift – you would know exactly when you got that vehicle." Tr. 10.

Trooper Davis returned to his patrol car and ran checks on Defendant's driver's license and the vehicle. While the checks were pending, Trooper Davis returned to Defendant and again asked him about his itinerary (14:09:30). Defendant again told Trooper Davis that he was traveling to New York. However, he did not know which part of Long Island he was going to (14:09:52). Tr. 88. Defendant told Trooper Davis he had been to his daughter's house in New York "about two times." Trooper Davis then asked Defendant whether he had grandchildren. Trooper Davis then told Defendant that it would just be a couple of more minutes because his computer was running slow. A light rain began to fall, so Trooper Davis suggested to Defendant that he sit in Defendant's vehicle while the radio and computer checks were completed (14:10:12). Defendant did so. Trooper Davis also returned to his vehicle (14:10:16).

Trooper Davis then learned by radio and computer that Defendant had been arrested previously for narcotics and weapons possession. Tr. 10. After Trooper Davis received the computer information and confirmed that the vehicle was not stolen and that there were no active warrants for Defendant, he exited his patrol car (14:14:28), and Defendant exited his

car to meet him. Trooper Davis immediately returned Defendant's driver's license to him (14:14:33). Tr. 12. Trooper Davis told Defendant that he was going to issue Defendant a verbal warning for following too closely (14:14:28). Tr. 12. Trooper Davis told Defendant to "be careful" and "have a safe trip" (14:14:49). This occurred about 15 minutes after the traffic stop began.

Defendant turned his body and took approximately two steps away from Trooper Davis in order to return to his vehicle. Trooper Davis then called out to Defendant and asked Defendant if he could "ask you a question before you leave." (14:14:50). Defendant said yes. Trooper Davis explained to Defendant that the state police see a great deal of illegal contraband on the highway. Trooper Davis then asked Defendant, "Can I search your car." (14:15:07). Defendant immediately gave verbal consent to the search. Defendant then made a slight move (14:15:16) as if to open the rear hatch back on his vehicle (a Ford Explorer), but Trooper Davis told him "not yet" and asked Defendant to stand over to the side of the patrol car. Trooper Davis then asked Defendant if he read English or Spanish better (14:15:18). Defendant said Spanish. Trooper Davis presented Defendant with a Spanish version of the Louisiana Consent to Search Form (Govt. Ex. 2) and explained that the form gives Trooper Davis the right to search Defendant's car, and if "you don't care, I need your signature right there" (14:15:31). Defendant signed the form and handed it back to Trooper Davis (14:15:41).

While Defendant was signing the form, two other troopers, Trooper Nash and Trooper Harris, arrived on the scene. Trooper Nash patted Defendant down for officer safety. Shortly thereafter, Trooper Davis received additional criminal history information from the El Paso Intelligence Center ("EPIC") confirming Defendant's prior arrests for large quantities of narcotics and two guns in 1991, 1994 and 1995 (14:16:00).

Trooper Davis and Trooper Nash began searching Defendant's vehicle. During the search of the vehicle, the officers located what they believed was a hidden compartment inside the vehicle. The compartment was discovered by tapping on the vehicle and by use of a density meter.[3] The area of the vehicle containing the manufactured compartment had been painted a color that was slightly inconsistent with the color of the remainder of the vehicle. Also, some fasteners in that area appeared to have been replaced. Tr. 16-17. Trooper Davis also found what he believed was a trap door to the hidden compartment located inside the right fender well of the vehicle. While the left side of the vehicle in the rear wheel well area was dirty, the side of the vehicle near the suspected trap door was cleaner.

Once the officers narrowed down the location of the hidden compartment, Defendant was advised of his <u>Miranda</u> rights. Tr. 16. The officers told Defendant that they found a manufactured compartment in the vehicle, and rather than tear up the vehicle to gain access

---

[3]Trooper Davis testified that density meters are used to detect whether an area of a vehicle that should be hollow has been modified into a compartment. Tr. 22.

to the compartment, the officers asked Defendant to show them how to access the compartment. Tr. 16. Regrettably, Trooper Davis' microphone, which was not activated during most of the search, did not pick up some of this conversation. However, near the end of the videotape, where Defendant finally admits there are drugs in the car and he shows the officers how to access the hidden compartment, the microphone is activated. The officers told Defendant that "the gig's up" (14:57:10). One officer can be heard telling Defendant that he has "seen it" and he is tired of being wet. (A light rain continued to fall during the search.) The officers also told Defendant that they were trying to help him (14:57:19). One of the officers asked Defendant if the drugs were under the right rear wheel well, and Defendant responded "yes" (14:57:10). Tr. 19. The officers then asked Defendant to show them how to access the compartment (14:57:50). The officers told Defendant that he is "doing the right thing" (14:58:40).

After Defendant showed the officers how to access the hidden compartment, Defendant was taken off to the side of the automobiles where he was handcuffed, and his Miranda rights were read to him again. Once the compartment was opened and the drugs were being removed, one of the officers told Defendant: "Thank you, sir, you just helped yourself out" (15:02:00).

When asked why Defendant was removed from the view of the videotape during that conversation, Trooper Davis responded: "No intentional reason. That's just where everyone was at." Tr. 62. When asked by the court why his microphone was not reactivated prior to

this off-camera conversation with Defendant, Trooper Davis stated: "I just never turned it back on after I started searching the vehicle." Tr. 62. Davis further testified as follows:

> I already knew there was contraband in there, and I was going to tear the vehicle up. I was trying to deter from tearing the vehicle to pieces. I already knew from all the other things that added up, that there was some type of contraband in there; and I was trying to get the contraband out without having to destroy the vehicle.

Tr. 63. During the conversation, Trooper Davis explained to Defendant that he was not under arrest. Tr. 74, 77.

Defendant testified at the suppression hearing that, after Trooper Davis returned his driver's license and registration to him, allowed him to begin to leave and then beckoned him back, Defendant did not believe he could ignore the trooper and leave the scene. According to Defendant: "He's a police officer. I had to do what he said." Tr. 111. Defendant testified that Trooper Davis told him that he was going to search the car, and Defendant said "sure." Tr. 111. Defendant testified that he speaks and understands only limited English. When he was presented with the Spanish consent-to-search form, he testified that he did not read the form because he did not have his glasses, which were in his vehicle. Tr. 112.

Defendant testified that he was born in Laredo, Texas but lived in Mexico until he was around 16 years old. Defendant was 52 years old at the time of the hearing, and he testified that he had been in the United States working since he was around 16 years old. Tr 118. Defendant testified that he traveled throughout the United States and held many jobs in the last 36 years (Tr. 121-122). Defendant admitted that he can read some of the English language and that he never told Trooper Davis that he did not understand him. Tr. 129-130.

Defendant also did not tell Trooper Davis that he could not read the Spanish consent form without his glasses.  Tr. 130.

Agent Hank Haines testified for the Government in rebuttal.  Agent Haines interviewed Defendant after Defendant was brought to Louisiana State Police Troop G Headquarters in Bossier City.  Prior to interviewing Defendant, Agent Haines advised Defendant of his rights and allowed him to read the <u>Miranda</u> rights card in Spanish.  Haines testified that Defendant did not have any glasses at the time he read the form, and he appeared to have no trouble reading along while Agent Haines read the form to him in English. Defendant also told Agent Haines that he understood his rights.  Defendant told Agent Haines that he had received his GED in Big Spring, Texas.  Agent Haines testified that he was with Defendant from the Saturday the stop was made until the following Monday and that Defendant had no difficulty whatsoever in understanding him or communicating with him in English.  Tr. 136.

**The Motion to Suppress**

In Defendant's original Motion to Suppress (Doc. 15), Defendant argued that the initial traffic stop and detention were made without reasonable suspicion or probable cause to believe that Defendant had committed, or was about to commit, any criminal offense. Defendant also argued that the traffic stop and detention of Defendant was not a consensual encounter.  Defendant further argued that all evidence obtained during the illegal detention and interrogation of Defendant and the subsequent search of his vehicle are the direct fruits of an unlawful seizure and must be suppressed.  Defendant's Memorandum, p. 2.

In Defendant's Post-Hearing Memorandum, Defendant refocused his arguments into four basic contentions: (1) his prolonged detention during the traffic stop was not supported by reasonable suspicion; (2) his continued detention after Trooper Davis decided not to issue a citation was not consensual and was not supported by reasonable suspicion; (3) his consent to search the vehicle was not voluntary; and (4) his consent to search did not dissipate the taint of the allegedly illegal detention.

The Government argues in its Opposition (Doc. 17) and its Supplemental Memorandum (Doc. 46) that Trooper Davis had probable cause to stop Defendant for following too closely and that there was reasonable suspicion of criminal activity to justify detaining Defendant for further investigation. The Government concedes that Trooper Davis wanted to search the vehicle. Supplemental Memorandum, p. 5. However, the Government argues that when Trooper Davis no longer had a right to detain Defendant (because the license and registration checks were clean), Trooper Davis returned the license and paperwork to Defendant and allowed Defendant to begin returning to his vehicle. The Government argues that the remainder of the encounter between Trooper Davis and Defendant was consensual. The Government also argues that Defendant's consent to search was given freely and voluntarily, and that the discovery of the existence of the hidden compartment supported a finding of probable cause to continue the search of the vehicle until the hidden compartment could be accessed.

**Law Regarding Traffic Stops**

**A.  General Rules**

The legality of a traffic stop is analyzed under the framework articulated in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). <u>See</u> <u>Knowles v. Iowa</u>, 525 U.S. 113, 117 (1998); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984); <u>United States v. Brigham</u>, 382 F.3d 500, 506 (5th Cir. 2004)(en banc).  Under the two-part <u>Terry</u> reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." <u>Terry</u>, 392 U.S. at 19-20; <u>Brigham</u>, <u>supra</u> at 506-507; <u>U.S. v. Lopez-Moreno,</u>  420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. <u>See</u> <u>United States v. Breeland</u>, 53 F.3d 100, 102 (5th Cir.1995).  In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002); <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. <u>See</u>, <u>e.g</u>., <u>United States v. Santiago</u>, 310 F.3d 336, 340 (5th Cir.2002).  In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from

each other. <u>Arvizu</u>, 534 U.S. at 274. However, it is clear that the officer's mere hunch will not suffice. <u>Terry</u>, 392 U.S. at 27. It is also clear that reasonable suspicion need not rise to the level of probable cause. <u>Arvizu</u>, 534 U.S. at 274.

An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. <u>United States v. Lenz</u>, 162 Fed. Appx. 379, 382 (5th Cir. 2006). The Supreme Court has made it clear that an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. <u>Scott v. United States</u>, 436 U.S. 128, 138 (1978); <u>Devenpeck v. Alford</u>, 543 U.S. 146 (2004) ("Our cases make clear that an arresting officer's state of mind ... is irrelevant to the existence of probable cause. [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); <u>Whren v. United States</u>, 517 U.S. 806 (1996) ("We think these cases ... foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."). On this point, the Fifth Circuit has stated that "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ...." <u>Goodwin v. Johnson</u>, 132 F.3d 162, 173 (1997).

As for the second prong of the <u>Terry</u> inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." <u>Brigham</u>, 382 F.3d at

507. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510. See also Santiago, 310 F.3d at 341-42; United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000). A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); U.S. v. Jenson, ____ F.3d ____, 2006 WL 2424825 (5th Cir. 2006). However, mere "uneasy feelings" and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking. U.S. v. Estrada, ____ F.3d ____, 2006 WL 2256493 (5th Cir. 2006).

## B.  Pre-<u>Brigham</u> Decisions

Several pre-<u>Brigham</u> traffic stop cases are  instructive in the resolution of the issue before the court: <u>United States v. Dortch</u>, 199 F.3d 193 (5th Cir. 1999) *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000), <u>United States v. Santiago</u>, 310 F.3d 336 (5th Cir. 2002) and <u>United States v. Jones</u>, 234 F.3d 234 (5th Cir. 2000).

 In <u>Dortch</u>, two officers stopped a vehicle at approximately 11:30 p.m. for following another vehicle too closely on I-20 in Beaumont, Texas.  The driver exited the car at the officer's request and produced his license and car rental papers, and he consented to a pat down search for weapons.  No weapons were found.  The officer examined the rental papers and determined that the car was rented to a third person and the driver was not listed as an authorized driver.  The officer then questioned the driver and his passenger.  The men gave inconsistent answers about the driver's relationship to the person who had rented the car and their travel plans.

While one officer questioned the driver, the other officer performed a computer check for warrants and to determine whether the car was stolen.  About eight minutes into the stop and while the computer check was pending, an officer requested consent to search the vehicle.  The driver gave consent to search the trunk, but not the vehicle; no search was performed at that time.

The officers told the driver he would be free to leave after the check for warrants was complete but that the officers would detain the car until they had performed a K-9 search of

it. A K-9 unit was then called. The driver was again patted down for weapons and again nothing was found.

About 14-15 minutes into the stop, the officers received the driver's criminal record and questioned him about it. The driver was not told that the computer check was complete, although it was, or that the driver would be free to go at any time. Approximately 19-20 minutes after the stop began, the officers noticed the arrival of the K-9 across the four-lane interstate and median. At that time, they informed the driver that the computer check had been completed and turned up nothing, but that the K-9 was going to perform a search nonetheless. The driver remained at the scene, and his driver's license and rental papers remained with the officers on the clipboard.

Another ten minutes elapsed during the K-9 search. The K-9 alerted on the driver's side door and seat. However, the subsequent search of the car uncovered no contraband. The K-9 handler then informed another officer that there could be contraband on the body of the person who had been sitting in the driver's seat. The driver then consented to a third pat down search. This time, however, the officer conducted a more thorough search of the driver's person and noticed a large hard bulge in his crotch area. The bulge was bags of cocaine. The driver was later charged with and found guilty of possession with intent to distribute cocaine.

On appeal, the driver did not question the legality of the initial stop, the K-9 search of the vehicle or the first two pat down searches. Instead, he argued that at some point the detention became unreasonable and exceeded the scope of intrusion allowed under Terry and,

therefore, the subsequently discovered cocaine was inadmissible as fruit of the poisonous tree. Alternatively, he argued that the third pat down search was itself unreasonable because of a lack of probable cause or consent.

The Fifth Circuit found that, while the detention and questioning of the driver during the running of the computer check was lawful, the Constitution was violated when the detention extended beyond the valid reason for the initial stop. Dortch, 199 F.3d at 198. The driver did not feel free to leave even after the computer check was completed, because the officers still held his license and rental papers and they told him they were going to detain the car until the K-9 arrived. The driver's acquiescence to stick around while the dogs completed their search could not be considered voluntary.

There was no reasonable suspicion that the driver was involved in drug trafficking. Id. at 199. The answers he and the passenger gave, even if suspicious, did not give rise to that inference. Rather, the answers gave rise only to a reasonable inference that the car might have been stolen. When the computer check came back negative, the driver should have been free to leave at that point. Once he was not permitted to drive away, the extended detention became an unreasonable seizure because it was not supported by probable cause.

The officers offered no justification for the 9-10 minute delay in requesting the K-9. Id. at 200. The officer's main duty was drug interdiction, including checking suspected vehicles for narcotics. It was reasonable, therefore, to expect that they would have anticipated needing a K-9 within a few minutes of stopping a suspect. Although the dog's alert on the car established probable cause to search the interior of the car and to detain the

driver until a more thorough search could be completed, by then it was too late – any probable cause established as a result of the K-9 search was subsequent to the unlawful seizure. Id.

The Court then addressed the issue of consent. Although the driver's detention exceeded the scope of a Terry stop, his consent to search may, but does not necessarily, dissipate the taint of a prior Fourth Amendment violation. Where there has been a prior constitutional violation, the government's burden to prove the defendant consented becomes more difficult. Id. at 201. Consent does not remove the taint of an illegal detention if it is the product of an illegal detention and not an independent act of free will. Id. at 202. In light of the prolonged unlawful detention of the driver, and in light of the fact that his previous refusals to consent to searches of the car were seemingly ineffective, the Court found that his consent could not be considered an independent act of free will. The Court noted that it was apparent from the videotape that the officers intended all along to detain the car until the dog arrived.

The Fifth Circuit concluded that, even if the driver's consent was voluntarily given, the consent was not valid. Because the causal chain between the illegal detention and the consent to the third body search was not broken, the search was nonconsensual. And because there was no probable cause to search the driver's person, the evidence obtained during that search should have been suppressed. Id. at 202-203.

In United States v. Santiago, supra, the trooper pulled the defendant over on the belief that the motorist's view was unlawfully obstructed by trinkets hanging from the motorist's

rearview mirror.  310 F.3d at 338-39. The defendant also was traveling 50 mph in a 70 mph zone.  After stopping the motorist, the trooper began to suspect that the car was stolen: the driver appeared nervous because his hands were shaking, the driver was traveling straight through to a distant destination, the driver could not remember his wife's name, the driver's vehicle was registered in another woman's name who was not the defendant's wife, and the driver had an explanation that was inconsistent from that of his passenger as to the parties' ultimate destination.

The officer then ran a computer check of the defendant's license and registration, which eventually came back negative.  Instead of returning the defendant's license and registration, the trooper called for and waited for backup.  The officer then explained problems with drugs being smuggled on the interstate highways, and he asked for and obtained consent to search the car.  A sealed compartment was discovered in the trunk.  The trooper then called for a K-9 which alerted on the car.  A subsequent search at the state police headquarters revealed drugs concealed within a false floor.

The Fifth Circuit concluded that the factors upon which the officer relied were insufficient as a basis for reasonable suspicion of drug activity because the officer had not articulated an objective basis to warrant a finding that Santiago had narcotics in his vehicle sufficient to justify the extended detention of him. Id. at 342.  The trooper's original justification for the stop ended at the time the computer check was completed.  At that point, there was no reasonable suspicion that the defendant was trafficking in drugs, but the trooper nonetheless continued his interrogation.  The court also noted that Santiago was stopped at

9:00 a.m; the highway on which he traveled was not deemed a major drug corridor; and Santiago's computer check did not elicit that he had a prior arrest or criminal record. There also was no evidence that, before asking for consent to search, the trooper had returned the driver's license and registration to defendant or told him that he was free to go. Under the circumstances, it was unreasonable for the trooper to continue to detain the defendant after the records check was completed. The Fifth Circuit concluded that the defendant's consent to search was not an independent act of free will, but rather a product of an unlawfully extended detention. Id. at 343.

In Jones, an officer pulled over a motorist and his passenger for a speeding violation. 234 F.3d at 237. The officer detained the defendant three minutes beyond the completion of the computer check, obtained the defendant's consent to search his vehicle, and subsequently found illegal narcotics. Id. at 241-42. The officer's basis for reasonable suspicion of drug activity pointed to the following facts: the defendant's inconsistent statement's regarding his place of employment, the defendant's contradictory responses about his passenger's employment, and the fact that the defendant's passenger had been previously arrested for a cocaine charge. Id.

The Fifth Circuit concluded that, based on the totality of the facts, that officer's three minute detention of Jones after the completion of the computer check was unreasonable. Jones was stopped in the morning (11:57 a.m.); Jones was not traveling on a known drug corridor; and neither Jones, nor his passenger, had criminal histories. Compared to the facts in Dortch, the Fifth Circuit explained that the trooper's bases for reasonable suspicion were

even less suggestive of reasonable suspicion and were "at best trivial." <u>Id</u>. at 241. The defendant's consent to search was not valid because the causal chain between the illegal detention and the consent was not broken. <u>Id</u>. at 342. Therefore, the search was nonconsensual. <u>Id</u>.

      **C. Brigham**

Against the backdrop of <u>Dortch</u>, <u>Santiago</u> and <u>Jones</u>, the court now turns to the Fifth Circuit's en banc decision in <u>Brigham</u>. In <u>Brigham</u>, the driver and three friends were pulled over at approximately 4:13 p.m. on a highway in East Texas for following too closely. The officer approached the driver and asked him to step out of the car and provide his license and insurance papers. The driver complied and produced a car rental agreement listing a 50 year old female as the lessee. No other drivers were authorized on the rental agreement. It did not appear that the 50 year old female was among the passengers in the car, so the officer became suspicious. The officer began asking the driver a series of basic questions about his group's travel plans. The driver stated they were coming from Houston. The driver stated they had stayed at a La Quinta Inn, but he had difficulty explaining where the motel was located. The driver also avoided eye contact and appeared to be extremely nervous. He responded to the officer's questions with questions of his own. Based on the officer's experience, he believed the driver was fabricating answers to the questions, and the officer decided to verify the driver's story with other occupants of the car.

At 4:17 p.m., four minutes after the stop began, the officer asked a passenger to step out of the vehicle. The passenger produced an I.D. card that the officer suspected was fake.

The passenger's description of the group's travel plans was inconsistent with that offered by the driver. The passenger also avoided eye contact and appeared extremely nervous.

At 4:20 p.m., the officer questioned the other two occupants. Both appeared confused and also were inconsistent concerning the group's travel plans. The officer then returned to his car to run computer checks on the car and the I.D. cards he had received. He told the driver that if his license was clean, they would soon be back on their way. Even though the car checked out, the officer remained suspicious given the behavior of the driver and occupants, their inconsistent descriptions of their travel plans and because, in his experience, the fact that a car is not yet reported stolen does not necessarily indicate that it was not actually stolen.

At 4:29 p.m., the results of the I.D. checks suggested that one of the occupant's I.D. card was likely a fake. The officer confronted that occupant and eventually learned his real name. The officer then returned to his car to check the occupant's actual identity. While that check was pending, the officer requested and received back-up from another officer.

The officer then provided the driver with a written warning for following too closely and returned his driver's license to him. He explained to the driver that one of his responsibilities was to intercept illegal contraband such as guns, stolen property and narcotics. The driver denied that any illegal items were in the car and acceded to a request for a search. The officer removed all of the passengers from the car and patted them down. At 4:42 p.m., approximately thirty minutes after the stop began, the officer discovered a cooler containing liquid codeine located in the trunk of the car.

The driver did not challenge the validity of the initial traffic stop. Instead, he argued that the officer exceeded the scope of the valid stop and prolonged the occupants' detention excessively and unconstitutionally when, after determining that neither the driver nor the other occupants of the car were its authorized drivers, the officer interrogated them about their travel plans and then instituted computerized vehicle and I.D. checks.

The initial panel decision held that the officer unconstitutionally extended the traffic stop by questioning the driver *before* he began a computer check on the I.D.s and the rental car's registration. The panel also held that the driver's consent to search the vehicle was involuntary because it was tainted by the Fourth Amendment violation. The underlying conviction was reversed.

The en banc Fifth Circuit found no Fourth Amendment violation and affirmed the conviction. According to the Court, the panel's decision erroneously required the officer to return to the patrol car immediately after the officer learned that none of the occupants seemed to be an authorized driver and undertake a registration check to determine whether the car had been reported stolen. Such an approach "misunderstands the Supreme Court's insistence on reasonableness rather than prescriptions for police conduct under the Fourth Amendment and extends this circuit's precedents too far." Id. at 507. Instead, the "correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." Id. The detention must be temporary and "last no

longer than necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Id., citing Dortch, 199 F.3d 200.

There is no constitutional impediment to an officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and run a computer check on them. Id. at 508. The officer also may ask about the purpose and itinerary of a driver's trip. Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made. All of these inquiries are within the scope of investigation attendant to the traffic stop. Id.

The Court rejected any notion that a police officer's questioning, *even on a subject unrelated to the purpose of a routine traffic stop*, is itself a Fourth Amendment violation. Id. "Detention, not questioning, is the evil at which Terry's second prong is aimed." Id. "Mere police questioning, without some nonconsensual restraint on one's liberty, is not a 'seizure' or detention." Id. A consensual interrogation may follow the end of a valid traffic stop, and such a consensual encounter does not implicate Fourth Amendment concerns. Id.

The officer's questioning of the driver and the occupants was within the scope of the detention justified by the traffic stop, particularly after the officer ascertained that the driver was not the owner or lessee of the vehicle; the lessee was not present in the car; and the versions of the itinerary conflicted. The process, from the time the officer started questioning the driver until he returned to his patrol car to check the registration, lasted only seven minutes.

Equally within the legitimate scope of the stop were the registration and license checks that the officer performed on the vehicle and its occupants. And once the officer learned that one occupant's I.D. card was a fake, he acted reasonably through further questioning to uncover the occupant's true identity and perform a correct background check. Because the officer was still waiting for the computer check at the time that he received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation. Id., citing Shabazz, 993 F.2d at 437.

The Fifth Circuit emphasized that there is "no constitutional stopwatch on traffic stops." Id. at 511. Instead the relevant question in assessing whether a detention extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Id. Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means. Id. There is no single formulaic approach that an officer must adopt in order to allay his reasonable suspicions during a traffic stop. Id. at 512. According to the Court:

> [W]e do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or the length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: **a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop**. [Emphasis added.]

Id.  Because there was no Fourth Amendment violation, the driver's consent to search the vehicle was not unconstitutionally tainted.  His consent was voluntarily given, and the evidence obtained from the car was properly obtained as the result of a consensual search. Id.

### D.  Post-Brigham

A recent decision of the Fifth Circuit applies Dortch, Santiago, Jones and Brigham in another traffic stop setting.  In U.S. v. Jenson, ____ F.3d ____, 2006 WL 2424825 (5th Cir. 2006) the defendant was stopped for speeding.  However, the defendant took between thirty seconds and a minute to bring his vehicle to a stop in response to the police officer's emergency lights.  The officer believed that the delay in bringing the vehicle to a stop might have been caused by the passengers in the vehicle trying to conceal something or corroborate stories.

When the driver exited his vehicle, the officer informed him of the reasons for the stop and asked him questions about his employment and the purpose of his trip.  The defendant, who was initially calm and cooperative, became excessively talkative, answering questions that were not asked.  The driver and the passengers provided the officer with their drivers' licenses, and the officer ran checks on the licenses.  The officer received word from dispatch that the licenses were clear.  However, the officer continued to question the defendant and a passenger about their employment, which resulted in a discrepancy between two answers. The officer believed the discrepancy was suspicious.  The officer then asked for permission

to search the vehicle, which was granted. There was no indication that the officer told the defendant he was free to leave before requesting permission to search.

The officer then told the defendant that he needed to conduct a pat-down search, and the defendant suddenly became upset and complained of harassment. The defendant started emptying his pockets, at which point the officer unholstered his weapon and told him to put his hands behind his back. The pat down search revealed a small "two-shooter" gun on the defendant's person. The officer then put the defendant in the patrol car and ran a background check on him. The check revealed that the defendant was a convicted felon. A subsequent search at the jail revealed a bag of marijuana in the defendant's sock.

The defendant conceded that the initial stop was justified, but he argued that the request to search the vehicle and the pat-down search of his person were not reasonably related to the circumstances justifying the stop. The district court denied the motion to suppress, but the Fifth Circuit reversed and suppressed the evidence. The Court found there was no reasonable suspicion to prolong the traffic stop. Thirty seconds to a minute was a reasonable amount of time for the defendant to respond to the flashing of the emergency lights. The officer also failed to articulate any particular connection between the allegedly suspicious behavior and drug or weapon possession. Furthermore, the inconsistent answers between the defendant and the passenger could not be considered because the alleged inconsistency did not arise until after the licenses cleared and the initial purpose of the stop had been fulfilled. It did not affect the analysis that only four minutes elapsed between the ID clearance and the defendant's consent to the search. According to the Court: "[T]here

was insufficient reason for suspicion to continue once Jenson's ID cleared; a constitutional violation occurred the *moment* the detention continued past that point." [Italics in original.]

The Court then turned to the issue of voluntariness of the defendant's consent. Even assuming the defendant's consent was voluntary (as the district court had found), the Fifth Circuit concluded that the Government failed to prove that the defendant's consent was an independent act of free will and not the product of the illegal detention. The consent followed closely on the heels of the illegal detention, and there was no evidence that the defendant knew he was free to leave or that his license had been returned to him, both of which might be viewed as intervening circumstances. In summary, the Court held that "the request to search occurred after the defendant's license cleared, and as instructed by <u>Dortch</u>, <u>Jones</u> and <u>Santiago</u>, there was no reasonable suspicion to justify prolonging the [detention], nor was the consent given independently of the illegal detention."

**Analysis**

In this case, the evidence shows that the first prong of the <u>Terry</u> analysis is easily met: Trooper Davis had probable cause to stop Defendant for traffic violations. Therefore, the traffic stop was justified at its inception.

The court turns to the second prong of <u>Terry</u>: whether Trooper Davis' subsequent actions were reasonably related in scope to the circumstances that justified the stop. Under <u>Brigham</u>, the officer's subsequent actions may also be related to "dispelling [the officer's] reasonable suspicion developed during the stop." <u>Brigham</u>, 382 F.3d at 507. Trooper Davis was well within the law to question Defendant about the identity and whereabouts of the

owner and about Defendant's travel plans. Id. at 508. He also could properly run computer checks on the vehicle and Defendant. Even questions unrelated to the purpose of the stop are permissible.

There is no evidence that Trooper Davis delayed the stop for an improper purpose. Defendant provided inconsistent information about his ownership of the vehicle and ambiguous responses about his itinerary. Trooper Davis also perceived that Defendant was unusually nervous. After Trooper Davis questioned Defendant about the vehicle and Defendant's itinerary, Trooper Davis returned to his vehicle and began the computer checks on Defendant. That sequence is permitted by Brigham.

Trooper Davis learned from the computer check that Defendant had prior drug and gun arrests, but there were no warrants outstanding on Defendant. Upon receiving those results, Trooper Davis exited his patrol car and returned Defendant's driver's license to him. Trooper Davis then gave Defendant a verbal warning, told Defendant to "be careful" and to "have a safe trip." At that point, Defendant was free to leave, and he began to walk away. It was only after Defendant had been released to leave the scene that Trooper Davis called out to Defendant and engaged him in a consensual conversation and encounter. Trooper Davis then asked for and received consent to search Defendant's vehicle. The consent was obtained just fifteen minutes into the stop.

The fact that Defendant's license had been returned to him and he was free to leave distinguishes this case from the cases cited by Defendant. In Dortch, the defendant never felt free to leave because the officers maintained custody of the defendant's driver's license and

told him they were detaining his vehicle until the K-9 arrived.  In <u>Santiago</u>, the computer checks on the defendant and his license came back clean, but the detention continued while the officer waited for back-up, even though there was no reasonable suspicion to justify further detention.  In <u>Jones</u>, the officer continued his detention of the defendant even after the computer checks came back negative and despite the absence of reasonable suspicion of criminal activity.  In this case, however, the detention of Defendant ended as soon as Trooper Davis' computer checks came back negative.  The detention, to the pointed it ended, was entirely lawful.

Shortly after Defendant's consent to search was obtained, Trooper Davis received more specific information from EPIC regarding Defendant's criminal history involving large quantities of drugs and guns.  About 45 minutes after the consent was obtained, the officers discovered evidence of the hidden compartment.  This included differences in paint on the two sides of the vehicle and one side was cleaner than the other.  The hidden compartment was found by tapping on the suspected area and by the use of the density meter.  Evidence of a hidden compartment provides probable cause for a search of a vehicle.  <u>U.S. v. Estrada</u>, <u>supra</u>.  However, Defendant's consent to the search provides sufficient justification for the continued examination of the vehicle until the access door of the compartment could be located.

A consensual search is a well-settled exception to the warrant requirement.  <u>United States v. Navarro</u>, 169 F.3d 228, 231 (5th Cir. 1999).  In determining whether a search based upon consent is valid, the government must prove that the search was voluntary and that the

defendant consented to the search or consent was obtained from a third party with the ability to give valid consent. <u>United States v. Jenkins</u>, 46 F.3d 447, 451-452 (5th Cir.1995). In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of which is dispositive. These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. <u>Id</u>.

Defendant was free to leave at the time the consent was sought; he was not in custody and was not being detained. Trooper Davis did not employ any coercive police procedures; to the contrary, he was exceedingly polite and courteous throughout the encounter.[4] Defendant was very cooperative throughout the encounter. He also had a basic education; he testified that he had received his GED in the United States. And Defendant likely believed that the drugs were so well concealed that they could not be discovered. Considering the totality of the circumstances, <u>Navarro</u>, 169 F.3d at 231, Defendant's consent to search was given voluntarily and freely.

There is no evidence that Defendant attempted to limit the scope of the search to the rear of the vehicle as Defendant now argues. Defendant, as the individual with knowledge

[4]Defendant argues that the coercive influences were "subtle, but present nonetheless." Post-Hearing Memorandum, p. 19. However, there is no evidence that any coercive influences were used.

of the contents of his vehicle, is responsible for limiting his consent. <u>United States v.</u> <u>Mendoza-Gonzalez</u>, 318 F.3d 663, 667 (5th Cir. 2003). <u>See also</u>, <u>United States v. West</u>, 219 F.3d 1171, 1177 (10th Cir. 2000)(where suspect does not limit the scope of the search and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle); <u>United States v. Cienfuegos-Paz</u>, 130 Fed. Appx. 682, 683 (5th Cir. 2005)("at no time did [defendant] protest the scope of the search or otherwise attempt to withdraw his consent, even though the consent form stated he could terminate the search at any time"). A reasonable person would have understood that the consent to search that Trooper Davis requested (and Defendant granted) included a search of the entire vehicle. <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991)(standard for measuring scope of consent is objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect); <u>United States v. Mendez</u>, 431 F.3d 420, 426 (5th Cir. 2005). In this case, Defendant's hand gesture is more appropriately seen as an invitation to Trooper Davis to begin the search at the rear hatch of the vehicle (perhaps to draw attention away from other parts of the vehicle), and it further indicates the confidence Defendant had that the drugs would not be discovered.

Defendant's original Motion to Suppress also made quick reference to the suppression of statements made by Defendant. However, Defendant does not argue in his lengthy Post-Hearing Memorandum that the (unspecified) statements were given in violation of <u>Miranda</u> or are otherwise subject to exclusion. In fact, the evidence shows that Defendant was properly advised of his <u>Miranda</u> rights before he was questioned about whether drugs were

in the vehicle and how to access the hidden compartment and drugs. While the officers were clearly getting frustrated as they tried to gain access to the hidden compartment, and while the officers told Defendant that he could help himself by cooperating, no improper promises were made and no undue pressure was applied. There is no evidence of overreaching either by direct coercion or subtle psychological persuasion. U.S. v. Bell, 367 F.3d 452, 460-461 (5th Cir. 2004); U.S. v. Mullen, 178 F.3d 334, 341 (5th Cir. 1999). Considering the totality of the circumstances, Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973), Defendant's post-Miranda admissions regarding the presence of the compartment and the drugs were freely and voluntarily made.

**Conclusion**

In summary, the initial stop of Defendant was justified, and the questions asked of, and checks run on, Defendant, were proper. Trooper Davis did not improperly prolong the stop, and when Defendant's license was cleared, the license was immediately returned to Defendant and he was free to leave. The subsequent search of Defendant's vehicle was the result of a consensual encounter in which Defendant freely and voluntarily consented to the search of his vehicle. That consent was not the product of an illegal detention.

Accordingly;

**IT IS RECOMMENDED** that Defendant's **Motion to Suppress (Doc. 15)** be **denied.**

**<u>Objections</u>**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. <u>See Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this the 11th day of September, 2006.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE